IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VANESSA DAVIS, *ex rel.*, A.L., a minor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 17 C 2190 |
| v. ) | |
| ) | Magistrate Judge Sidney I. Schenkier |
| NANCY A. BERRYHILL, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff Vanessa Davis has filed a motion for summary judgment on behalf of her minor daughter, A.L., seeking reversal or remand of the final decision of the Acting Commissioner of Social Security ("Commissioner") denying her claim for Social Security disability benefits (doc. # 17: Pl.'s Mot. for Summ. J.). The Commissioner has filed a response asking the Court to affirm its decision (doc. # 25: Def.'s Resp.). For the reasons that follow, we grant plaintiff's motion.

### I.

Ms. Davis applied for SSI on her daughter's behalf on July 20, 2012, alleging A.L. became disabled on November 17, 2005 as a result of a learning disability and asthma (R. 298, 301). The application was denied initially on October 17, 2012, and upon reconsideration on July 22, 2013 (R. 107, 117). Upon timely request, a hearing was held before an Administrative Law Judge ("ALJ") on March 10, 2015 (R. 34-98). The ALJ issued an unfavorable decision on March 30, 2015, finding that A.L. was not disabled (R. 12-33). The Appeals Council denied Ms. Davis'

---

[1] On July 24, 2017, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. # 12).

request for review, making the ALJ's ruling the final decision of the Commissioner (R. 1-6). *See Loveless v. Colvin*, 810 F.3d 502, 506 (7th Cir. 2016).

## II.

This case relates to the issue of childhood disability benefits. The procedure for determining whether a child is disabled differs from the familiar five-step process used for adult disability analysis (*compare* 20 CFR 416.924(a) with 20 CFR § 1520(a)(4), and our analysis will be aided by a description of the legal standard before, rather than after, our summary of the relevant facts.

A child will be found disabled for the purposes of qualifying for SSI benefits if he or she has a "medically determinable physical or mental impairment, which results in marked and severe functional limitations" which "has lasted or can be expected to last for a continuous period of not less than 12 months." *See* 42 U.S.C. § 1382c(a)(3)(C)(i). There is a three-step analysis to determine whether a child meets this definition. 20 C.F.R. § 416.924(a). *First*, if the child is engaged in substantial gainful activity, she is not disabled, regardless of what impairments she has or their severity. *Id. Second*, if the child does not have a severe medical impairment or combination of impairments, then she is not disabled and her claim will be denied. *Id. Third*, if the child has a severe impairment or combination of impairments, then she will be found disabled if these impairments meet, medically equal, or functionally equal the severity of any of the Listings of Impairments contained in 20 C.F.R. pt. 404, subpt. P, App. 1. *Id. See, Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009).

At the third step, an ALJ must determine if the claimant's impairment functionally equals a Listing by analyzing the severity of the impairment with respect to six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others;

2

(4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(a).[2] An ALJ will find that an impairment functionally equals a Listing if she concludes the claimant has an "extreme" limitation in one domain or a "marked" limitation in two domains. 20 C.F.R. § 416.926a(a). A "marked" limitation exists when the impairment *seriously* interferes with the child's "ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2)(i) (emphasis added). An "extreme" limitation exists when a child's "impairment interferes *very seriously* with [his] ability to independently initiate, sustain or complete activities." 20 C.F.R. § 416.926a(e)(3)(I) (emphasis added). As we explain below, the issue before us concerns whether the ALJ properly supported her determination that A.L.'s impairments do not functionally equal a Listing because she has no extreme limitations, and has a marked limitation in only one domain (in acquiring and using information).

### III.

A.L. was born on January 28, 1998. She was an adolescent and had just begun attending Southland College Prep High School as a freshman in September 2012 when her mother applied for SSI benefits on her behalf (R. 303). The medical record with respect to A.L.'s impairments begins about the time of this application; there is no evidence of treatment or testing A.L. received for either her asthma or her learning disability prior to 2012.[3] While at Southland, A.L. attended mainstream classes for English, science, and social studies with the assistance of an aide, and special education math classes; she also had two academic support periods each day (R. 41-42, 311).

---

[2] Claimant does not argue that any of her impairments meet or medically equal a Listing; claimant argues only that she functionally equals a Listing, and that is the focus of our discussion.

[3] Plaintiff does not contest the ALJ's finding that A.L.'s asthma was not severe enough to support a finding of disability.

3

## A.

As part of A.L.'s claim for benefits, three of her teachers completed questionnaires for the Bureau of Disability Determination Services. The questionnaires asked each teacher to assess A.L.'s abilities across each of the six domains used to determine childhood disability. In addition to having space for the teachers to write narrative information, the forms contained check boxes that broke down the essential functions of each domain and asked the teacher to rate the child on a scale of one-to-five for each function, with one indicating "no problem," two indicating "a slight problem," three indicating "an obvious problem," four indicating "a serious problem," and five indicating "a very serious problem" performing the particular task (R. 311).

On August 29, 2012, special education teacher Cheryl Novak completed a questionnaire; at the time she had been working with A.L. for one month while she was in the ninth grade (R. 310). Ms. Novak noted A.L.'s current instructional levels to be 4th to 5th grade for reading, 4th grade for math, and 4th to 5th grade for written language (*Id.*). In assessing A.L.'s abilities in the domain of acquiring and using information, Ms. Novak rated A.L. as having an "obvious problem" in seven criteria[4] and a "serious problem" in three criteria.[5] With respect to the second domain, attending and completing tasks, Ms. Novak assessed A.L. as having serious problems with two criteria: carrying out single-step instructions and carrying out multi-step instructions (R. 312). She evaluated A.L. as having obvious problems with two other criteria: paying attention when spoken to directly, and working at a reasonable pace/finishing on time. Ms. Novak found that A.L. had

---

[4] These criteria are: (1) comprehending oral instruction; (2) understanding and participating in class discussions; (3) providing organized oral explanations and adequate descriptions; (4) expressing ideas in written form; (5) learning new material; (6) recalling and applying previously learned material; and (7) applying problem-solving skills in class discussions (R. 311).

[5] These criteria are: (1) understanding school and content vocabulary; (2) reading and comprehending written material; and (3) comprehending and doing math problems (R. 311).

4

either no problems or slight problems in the remaining nine activities listed for this domain, and did not assess her as having any "very serious" problems (*Id.*).[6]

Danielle Van Vliet completed a questionnaire on February 10, 2015, when A.L. was in the 11th grade (R. 356). At the time, she had known A.L. for three years and had seen her 14-18 times per year for help with social skills (R. 349). In the domain of acquiring and using information, Ms. Van Vliet assessed A.L. as having "a serious problem" in understanding school and content vocabulary, in reading and comprehending written material, and in understanding and participating in class discussions (R. 350). She found that A.L. had an obvious problem comprehending and doing math problems and expressing ideas in written form, and no more than a slight problem in the remaining three functional areas (*Id.*). In her accompanying notes, Ms. Van Vliet wrote that A.L. had "grown significantly in these areas. However, she needs reinforcement and practice for these skills to gain mastery" (*Id.*). With respect to the domain of "attending and completing tasks," Ms. Van Vliet did not assess A.L. as having any serious or very serious problems. She found that A.L. had obvious problems carrying out multi-step instructions, in changing from one activity to another without being disruptive, and in working without distracting herself or others, but she had nothing more than a slight problem in any of the other functions (R. 351). Ms. Van Vliet's written notes stated that A.L. "can get distracted by social relationships, especially when she feels competitive pressure" (*Id.*).

Finally, on February 10, 2015, special education teacher Heena Alavi completed a questionnaire assessing A.L. while she was in the 11th grade (R. 357-65). At the time she

---

[6] Ms. Novak did not assess A.L. as having anything more than a slight problem in any of the remaining domains as they relate to A.L.'s learning (R. 313-16). She did assess A.L. as having "an obvious problem" with some activities related to moving about and manipulating objects, but the questionnaire makes it clear that this assessment refers only to A.L.'s asthma, not her learning difficulties (R. 314).

5

completed the questionnaire, Ms. Alavi had known A.L. for three and one-half years and worked with her as her co-teacher in three of her classes; she also helped A.L. in preparing for the ACT test (R. 357). Ms. Alavi wrote that A.L. was working at a reading level of "4th grade, 7th month," a math level of "5th grade, 3rd month," and a written language level of "7th grade" (R. 357).

Ms. Alavi opined that in the domain of acquiring and using information, A.L. had a "very serious problem" understanding and participating class discussions and providing organized oral explanations and adequate descriptions (R. 358). She assessed A.L. as having "a serious problem" reading and comprehending written material, comprehending and doing math problems, and learning new material (*Id.*). Ms. Alavi assessed the remainder of A.L.'s abilities in this domain as either "an obvious problem" or "a slight problem" (*Id.*). Ms. Alavi wrote detailed notes about A.L.'s abilities in this domain, noting that (1) A.L. can usually understand verbal instructions when she is fully attentive; (2) A.L. needs modification and accommodation to perform at the level of her non-disabled peers; (3) A.L. struggles to understand grade-level text without support; (4) she likes math, but is in an instructional-level class and has trouble with multi-step problem-solving; (5) A.L. is very shy and won't participate in group discussions without encouragement; (6) she struggles at times with oral expression; (7) she expresses herself more easily in written form, although it can take her twice as long to understand a writing prompt as her non-disabled peers; and (8) A.L. acquires new material slowly (*Id.*).

In the domain of attending and completing tasks, Ms. Alavi opined that A.L. had no serious or very serious problems (R. 359) She had obvious problems in carrying out multi-step instructions and working at a reasonable pace, and slight or no problems with the remaining functions (*Id.*). Ms. Alavi's written notes indicate that A.L. is easily distracted in class and sometimes zones out, that she can be redirected when she gets off-task, but is prone to continued distraction (*Id.*). Ms.

6

Alavi also wrote that A.L. had difficulties with multi-step problems due to her slow processing, and that it also sometimes caused her to turn in her work late (*Id.*). Ms. Alavi noted that A.L. used her accommodations, such as asking school staff for help, so that she could get her work finished on-time (*Id.*).

As part of her application for benefits, A.L. underwent psychological testing with Elaine Rado, Ph.D, on October 5, 2012 (R. 374). Dr. Rado administered the Wechsler Intelligence Scale for Children-IV (IQ) test; A.L. scored a full-scale score of 77, which fell in the borderline range of intellectual functioning (R. 375).[7] Dr. Rado noted that A.L. tended to speak softly and mumble during the exam, and thus, Dr. Rado understood A.L. about 60 percent of the time (R. 376). A non-examining state agency doctor, David Biscardi, Ph.D., reviewed the record and determined that, based on Dr. Rado's evaluation, A.L. had less than marked limitations in all domains, and thus, was not disabled (R. 102-103).

On September 29, 2014, A.L. and her mother participated in a meeting to review her individualized education program (IEP) with various teachers and special education professionals at her school (R. 405). The written report from the meeting noted that A.L. had undergone academic testing prior to the meeting and that she demonstrated academic skill at the fifth-sixth grade level for most subjects, and the seventh grade level for math (R. 406). The report noted that A.L. was able to perform class work in the general education classroom for most of her classes and could perform work with certain modifications and accommodations (*Id.*). Accommodations included having curriculum modified to her reading level, being given the ability to provide

---

[7] "The term borderline intellectual functioning describes a group of people who function on the border between normal intellectual functioning and intellectual disability, between 1 and 2 standard deviations below the mean on the normal curve of the distribution of intelligence, roughly an IQ between 70 and 85." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4967780/ (visited on July 11, 2018).

7

answers orally, and being provided notes of classroom lectures to ensure accuracy in her own notes (*Id.*).

### B.

At the hearing, A.L. testified that in school, she liked her math class the most and struggled with reading and writing in her English class, particularly by not being able to catch onto things quickly enough (R. 41). A.L. went to her school's homework club at least once per week and asked her mother or sister for homework help on a daily basis (R. 46). She also testified that she had trouble counting change or telling time on an analog clock (R. 51).

A.L. testified that she read for pleasure, including the Divergent series, and that she was able to understand what she was reading and finish the books (R. 55-56). She used Twitter and made photo collages on her computer (*Id.*).

### C.

In her opinion, the ALJ used the three-step framework for determining childhood disability set forth in 20 CFR 416.924(a), described above. She found that A.L. did not engage in any substantial gainful activity, and that she had the severe impairments of asthma and borderline intellectual functioning (R. 18). Next, the ALJ concluded that A.L. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled any of the Listing impairments (*Id.*). Specifically, the ALJ found that A.L. had marked limitations in the domain of acquiring and using information, but less than marked limitations in the remaining domains, and therefore, was not disabled (R.22-23).[8]

---

[8] The ALJ summarized the regulations' descriptions of what each domain entails and examples of limited functioning in each area. *See* 20 CFR 416.926a(g) and SSR 09-3p. The regulations' examples do not categorize particular deficiencies as demonstrating marked or extreme limitations; they are used more as guidance to describe what kinds of limited functioning in each domain a child might have (R. 23). The domain of acquiring and using information, for example, "involves how well children perceive, think about, remember, and use information in all settings" (*Id.*). Examples of limitations include such things as difficulty comprehending written or oral directions,

In finding that A.L. had marked limitations in the domain of acquiring and using information, the ALJ noted that her IEP indicated that A.L. functioned below grade level in all subject areas, primarily attended general education classrooms with modifications and support, and attended a special education math class (R. 24). The ALJ explained that A.L. testified that she struggled with reading, but also was able to complete the entire Divergent series of young-adult books and understand them (*Id.*).[9] A.L.'s mother testified that A.L. had trouble retaining what she read, which was consistent with the services she received under her IEP (*Id.*). The ALJ summarized the three teacher questionnaires in detail (R. 21-22), and noted that they assessed A.L. as having "serious to very serious problems" in acquiring and using information (R. 24). The ALJ also mentioned the teachers' comments that A.L. needed accommodations to be able to perform at the level of her peers (*Id.*).

The ALJ mentioned, but gave little weight to, the medical opinion of the non-examining state agency doctor who concluded that A.L. had less than marked limitations in all domains and thus was not disabled (R. 103-04). The ALJ dismissed the opinion because she found that the evidence as a whole supported a finding that A.L. did have a marked limitation in acquiring and using information.

In concluding that A.L. had less than marked limitations in the domain of attending and completing tasks, the ALJ noted that A.L.'s teachers indicated she has "some limitations in this

---

struggles in following simple instructions, difficulty in solving math questions, the ability to talk in only short, simple sentences and difficulty explaining what he or she means (*Id*).

[9] The Divergent series has been categorized by Scholastic as appropriate for grades "6-8, 9-12." It is rated at guided reading level Z, the highest level, although Scholastic reading levels end at the sixth grade. https://www.scholastic.com/teachers/books/divergent-by-veronica-roth/ (visited on July 16, 2018).

9

area" (R. 25).[10] The ALJ discussed A.L.'s testimony, including that she gets help with her homework and that although she hands in all of her homework, it is late about once per week (R. 25). A.L. also testified that she may "zone out" once or twice during a one-hour class for about five minutes (*Id.*). The ALJ noted that A.L. has a laptop that she uses for schoolwork, sending one-sentence "tweets," listening to music, and creating photo collages (*Id.*). Finally, the ALJ mentioned that A.L.'s mother testified that A.L. sometimes follows her home chore chart correctly, but sometimes does not (*Id.*).

## IV.

"We will review the ALJ's decision deferentially, and will affirm if it is supported by substantial evidence." *Decker v. Colvin*, No. 13 C 1732, 2014 WL 6612886 at *9 (N.D. Ill. Nov. 18, 2014). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Alevras v. Colvin*, No. 13 C 8409, 2015 WL 2149480 at *4 (N.D. Ill. May 6, 2015). The court will not reweigh evidence or substitute its own judgment for that of the ALJ. *Decker*, 2014 WL 6612886 at *9. In rendering a decision, the ALJ "must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence." *Id.*, *quoting Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). Instead, an ALJ must explain his analysis of the evidence with "enough detail and clarity to permit meaningful appellate review." *Staten v. Colvin*, 14 C 3055, 2015 WL 790978 at *5 (N.D. Ill. February 24, 2015).

---

[10] According to the regulations, the domain of attending and completing tasks considers "how well a child is able to focus and maintain attention, and how well she is able to begin, carry through, and finish activities, including the mental pace at which she performs activities and the ease of changing activities" (R. 24). Some examples of functional limitations in this domain include being slow to focus on or complete activities of interest, repeatedly becoming side-tracked from activities, becomes easily frustrated and gives up on tasks the child is capable of completing, requires extra supervision to stay on-task, and cannot plan, manage time, or organize self to complete assignments (R. 24-25), 20 CFR 416.926a(h)(3).

In her motion for reversal or remand, Ms. Davis contends that the ALJ erred by (1) improperly evaluating the teacher questionnaires and other opinions; and (2) failing to analyze evidence that A.L. had marked limitations in the ability to care for herself. Because we remand based on the ALJ's failure to adequately address the opinion evidence in the record, we do not reach the second assignment of error.

Plaintiff's argument that the ALJ failed to properly weigh the teachers' and medical opinions can be distilled to the contention that the ALJ did not build a logical bridge from the evidence to her conclusion that A.L. was not disabled. We agree. While the regulations do not require an ALJ to give a specific weight to the opinions of non-medical sources such as teachers, they make it clear that the opinions of non-medical sources can be useful, and may even outweigh the opinions of medical sources in some cases. 20 CFR §416.927(f)(1). In analyzing non-medical sources, an ALJ must consider the same factors used to evaluate medical opinions, with the understanding that not every factor may be relevant to the non-medical opinion (*Id.*).[11] While the ALJ thoroughly summarized the three teacher questionnaires and discussed Dr. Rado's report, summarization is not a substitute for analysis. *Williams v. Berryhill*, No. 17 C 1936, 2018 WL 264201 *6 (N.D. Ill. January 2, 2018). Once the ALJ relied on the teacher questionnaires in her analysis, her failure to address the factors relevant to an evaluation of those opinions prevented the Court from following her reasoning.

The ALJ's failure to explain how she used the information in those opinions to support her decision is a serious shortcoming. The Court "cannot uphold a decision by an administrative

---

[11] These factors are (1) whether the source has examined the claimant; (2) whether the source has treated the claimant, the length of treatment and nature of treatment; (3) whether the source's opinion is supported by other evidence; (4) whether the opinion is consistent with the record as a whole; and (5) whether the source's specialty is related to the issues relevant to those for which the claimant is seeking benefits. 20 CFR §416.927(c)

11

agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). And because the ALJ appeared to weigh all the evidence equally, despite the fact that some of it could support a finding that A.L. was disabled while other parts might suggest that A.L. was not disabled, the ALJ's failure to explain how she used the evidence in her conclusion persuades us to remand the case.

### A.

With respect to the domain of acquiring and using information, the ALJ did not explain how she decided that A.L. had a marked limitation in this area, as opposed to an extreme limitation. As we explained above, to be found disabled, a claimant must be found to have marked limitations in at least two of the six domains or an extreme limitation in one domain. A marked limitation is characterized by a serious deficiency in the ability to perform the domain's tasks and an extreme limitation means that the claimant has a very serious deficiency. The three teacher questionnaires all agreed that A.L. had limitations in acquiring and using information, but they vary in their assessments of severity. Ms. Alavi opined that ALJ had very serious limitations in two functional areas under this domain, which could support an "extreme" determination. In contrast, Ms. Novak and Ms. Van Vliet assessed A.L. as no more than seriously impaired in some of the functional areas, which suggests a marked limitation at most. The ALJ does not explain how or why, based on these assessments, she concluded that A.L. had a marked limitation in acquiring and using information.

Defendant argues that the ALJ must have considered the fact that only one of the three teachers found A.L. to have "very serious" functional impairments, while the other two teachers found that A.L. had no more than "serious" functional impairments, and on that basis determined

A.L. to have a marked and not an extreme limitation in the domain of acquiring and using information. Defendant contends it was thus harmless error for the ALJ not to assign a specific weight to each of the teacher questionnaires, because assigning a weight would not change the ALJ's analysis (Def. Resp. at 3-4).

The problem with the Commissioner's argument is that the ALJ doesn't say any of this, and we must review the decision that the ALJ wrote rather than the decision she might have written. *Roddy v. Astrue,* 705 F.3d 631, 637 (7th Cir. 2013), *citing SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). The ALJ states that A.L.'s teachers variously assessed her as having serious or very serious problems in acquiring and using information. But the ALJ did not explain what weight she gave to each opinion in concluding that A.L. did not have a very serious problem (and thus a disability limitation) in this domain. And, even if we could infer that the ALJ must have given more weight to the opinions of Ms. Novak and Ms. Van Vliet (who found a serious problem) than to the opinion of Ms. Alavi (who found a very serious problem), the ALJ does not say why she did so. It is possible that the ALJ had a number of reasons for deciding that A.L. had a marked rather than an extreme limitation. But absent an explanation from the ALJ, we cannot determine what those reasons were or whether they were sound ones.

For example, if the ALJ simply decided that A.L. did not have an extreme limitation because only one of the three teachers assessed her as having very serious problems, that would not be a permissible analysis. The regulations require an ALJ to consider the quality of the non-medical source opinions, and not merely their quantity. In this case, Ms. Alavi, who opined that A.L. had very serious problems in the first domain, was a special education teacher who had longstanding and extensive contact with A.L. We offer no view as to whether the "quality" of Ms. Alavi's relationship with A.L. made her opinion entitled to greater weight than those of the other

two teachers, one of whom had only known A.L. for a month and the other of whom did not specialize in special education. While it is not our role to second-guess the weight an ALJ gives a particular opinion, it is our duty to ensure that the ALJ has adequately explained why she has given an opinion particular weight. The ALJ failed to discharge her obligation to do so here. As a result, a remand is in order. *Hopgood ex. rel. L.G. v. Astrue,* 578 F.3d 696, 700 (7th Cir. 2009) (reversing ALJ's decision when he failed to explain why he did not credit portions of the record that were favorable to the claimant).

### B.

The ALJ's analysis of the second domain, attending and completing tasks, further demonstrates her failure to build a logical bridge from the evidence to her conclusion. In this case, one teacher – Ms. Novak – assessed A.L. as having serious problems in two functional areas, while the other two teachers assessed A.L. as having no more than obvious problems in any part of the domain. But the ALJ did not acknowledge Ms. Novak's opinion of a "serious" problem, instead noting only that the teachers as a whole assess "some limitations in this area." The ALJ thus appears to have treated all three teacher questionnaires as equally supporting her conclusion, but failed to explain why. And, the ALJ's failure with respect to the second domain cannot be dismissed as harmless, "given that the ALJ found that Claimant met the severity of one domain. This would mean that a similar finding with respect to only one other domain would have resulted in a finding of disability." *Burrell v. Berryhill,* No., 16 CV3480, 2017 WL 714116 *6 (N.D. Ill. February 23, 2017).

## CONCLUSION

For the reasons stated above, we grant Ms. Davis' motion for summary judgment (doc. # 17) and deny the Commissioner's motion (doc. # 25). We remand the case for further proceedings consistent with this opinion. This case is terminated.

**ENTER:**

											_____
											**SIDNEY I. SCHENKIER**
											**United States Magistrate Judge**

**DATE: July 18, 2018**